# United States Court of Appeals
## For the First Circuit

No. 09-1985

EILEEN AHERN ET AL.,

Plaintiffs, Appellants,

v.

ERIC K. SHINSEKI, SECRETARY, DEPARTMENT OF VETERANS AFFAIRS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

[Hon. Lincoln D. Almond, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Selya and Thompson, Circuit Judges.

Thomas E. Folcarelli for appellants.
Richard B. Myrus, Assistant United States Attorney, with whom
Peter F. Neronha, United States Attorney, was on brief, for
appellee.

December 13, 2010

**SELYA**, **Circuit Judge**.  In the last half-century, Congress has enacted a safety net of antidiscrimination laws designed to protect workers' rights.  These laws serve salutary purposes, but they are not intended to function as a collective panacea for every work-related experience that is in some respect unjust, unfair, or unpleasant.  This case, which involves the introduction of an abrasive supervisor into a workplace accustomed to a kinder, gentler way of doing business, illustrates the point.

The underlying dispute takes the form of an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a).  The plaintiffs proffer claims of gender-based discrimination, retaliation, and constructive discharge.  The district court rejected these claims and entered summary judgment for the employer.  The plaintiffs now appeal.

We conclude, as did the court below, that the evidence is insufficient to permit a reasonable factfinder to resolve any of the claims in the plaintiffs' favor.  Accordingly, we affirm.

## I.  BACKGROUND

We rehearse the facts in the light most agreeable to the nonmoving parties (here, the plaintiffs), consistent with record support.  Cox v. Hainey, 391 F.3d 25, 27 (1st Cir. 2004); Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990).  Under that paradigm, the nonmovants are entitled to the benefit of all reasonable inferences that the facts will bear.  Noviello v. City

<u>of Boston</u>, 398 F.3d 76, 81-82 (1st Cir. 2005).  We recount here only a synopsis, reserving further facts for inclusion in our discussion of particular claims.

We start with the cast of characters.  The plaintiffs, Eileen Ahern, Debra Auger, Maureen Mastalerz, and Lynda Parker, are women who, at the times material hereto, were employed as radiology technologists in the diagnostic imaging service (DIS) at a Department of Veterans Affairs medical center in Providence, Rhode Island (the VA Hospital).  Ahern and Mastalerz worked primarily as computed tomography (CT) technologists, Auger split her time between CT and angiography, and Parker functioned as a "backup angiography technologist/clinical coordinator."  The plaintiffs' immediate superior was the chief technologist, Joan Beaudoin, who in turn reported to the administrative officer, Mehrdad Khatib.  Khatib — the alleged villain of the piece — reported in turn to the chief of the DIS, Dr. Casimira Sta Ines.  The defendant Eric K. Shinseki is the Secretary of Veterans Affairs; he is sued in his official capacity.

To understand the plaintiffs' allegations, it is necessary to understand the way in which the DIS operated.  As administrative officer, Khatib was responsible for personnel management.  When Khatib took over, the DIS employed sixteen staff technologists, fourteen of whom were female.  At Khatib's instigation, a number of contract technologists were brought

-3-

aboard.  These contract technologists were independent contractors rather than employees and, as such, were not entitled to receive the usual perquisites of federal employee status.  The new recruits, eleven of whom were male and seven of whom were female, nevertheless performed the same duties as the staff technologists.

Khatib's portfolio also included responsibility for the day-to-day operations of the DIS.  Beginning in September of 2003, the plaintiffs and their coworkers made numerous complaints to Beaudoin and Dr. Sta Ines about Khatib's performance of these duties.  In meetings held in October 2003 and January 2004, they protested that Khatib's management style was creating "stressful working conditions and [a] hostile work environment in DIS."

In response, Dr. Sta Ines sent Khatib two memoranda (dated February 2 and 9, 2004, respectively), bringing these charges to his attention and offering to "work together to resolve any issues and continue the numerous improvements that have occurred since your arrival."

Another relevant series of events transpired in the same time frame.  Early in 2004, Khatib advised Beaudoin that he believed the CT department was functioning inefficiently and causing delays in service.  He attributed this malfunctioning in part to the fact that the technologists in the CT department operated on a compressed weekly schedule.  Under that schedule, each of them worked four ten-hour days per week.

On March 31, 2004, Khatib recommended to Dr. Sta Ines that the CT technologists, like all other technologists in the DIS, should work five eight-hour shifts per week. Dr. Sta Ines endorsed a modified version of this proposal and announced the plan in April. The CT technologists opposed the change on a number of grounds, claiming that it would make their work schedules uncertain, limit their overtime opportunities, and curtail their freedom to conduct personal business during the week.

On April 22, 2004, the plaintiffs and five coworkers (two male and three female) submitted a lengthy memorandum to Dr. Sta Ines, which they identified as a "formal complaint of harassment, sexual discrimination and creation of a hostile work environment." In this diatribe, they suggested that Khatib had instigated the scheduling change as a retaliatory measure "after complaints were made about him at the meeting with Dr. Sta Ines"; that he had treated a particular male contract technologist "with more respect"; that he was "bullying" the staff; and that he harbored "unreasonable and unrealistic expectations" about them, thus setting them up "to look and feel like failures."

Despite the charge of "sexual discrimination," the plaintiffs' complaints were not restricted to Khatib's treatment of female employees. Some complaints were gender-neutral; others groused that he had disrespected a male doctor and treated certain male file clerks "horribly."

The memorandum prompted the Department of Veterans Affairs (DVA) to commission a probe of this compendium of complaints. Upon completion of its investigation, the DVA review team issued a report of its findings under date of September 30, 2004. It concluded that Khatib had not engaged in discriminatory practices but that his abrasive management style had contributed to a serious morale problem among a majority of the staff.

Khatib retained his post. His proposal for conversion of the CT department to a five-day workweek did not fare as well. The plan was never implemented.

Although the record is short on particulars, the plaintiffs allege that internal strife continued even after the review team's investigation. Citing anxiety and stress ostensibly induced by Khatib's antics, each of them looked for greener pastures. Ahern took an extended medical leave, later returned to work, and eventually resigned. Mastalerz took a medical leave, returned to work briefly, and then found employment elsewhere. Parker quit to take a job with another employer; Auger took annual leave and never came back. By 2005, all of the plaintiffs had left their positions at the VA Hospital.

The plaintiffs did not go quietly but, rather, filed charges of gender-based discrimination, retaliation, and harassment with the Equal Employment Opportunity Commission. After obtaining

right-to-sue letters, they brought suit in the United States District Court for the District of Rhode Island.

The operative pleading for present purposes is the plaintiffs' second amended complaint. In it, they alleged disparate treatment with respect to hiring, compensation, and promotion; retaliation; and constructive discharge. Following the completion of pretrial discovery, the defendant moved for summary judgment. The plaintiffs opposed the motion. The district court referred the matter to a magistrate judge.

After a hearing, the magistrate judge recommended that the motion be granted in its entirety. Ahern v. Shinseki, No. 05-cv-117, 2009 WL 1615402, at *22 (D.R.I. June 9, 2009).[1] He concluded that the plaintiffs had failed to adduce any probative evidence in support of many of their allegations, id. at *18-19; that they had failed to identify any adverse employment actions, id. at *13; and that they had failed to show that similarly situated male employees had been treated more favorably, id. The plaintiffs objected. See Fed. R. Civ. P. 72(b)(2). The district court adopted the magistrate judge's recommendation. Ahern, 2009 WL 1615402, at *9. This timely appeal followed.

---

[1] The electronic version of the opinion, filed by the district judge, annexes and incorporates the magistrate judge's report and recommendation. Both documents, therefore, share the same citation.

## II.  ANALYSIS

We review a district court's grant of summary judgment de novo.  Noviello, 398 F.3d at 84.  "We will affirm only if the record reveals 'no genuine issue as to any material fact' and 'the movant is entitled to judgment as a matter of law.'"  Vineberg v. Bissonnette, 548 F.3d 50, 55 (1st Cir. 2008) (quoting Fed. R. Civ. P. 56(c)).[2]  In carrying out that tamisage, we must scrutinize the evidence in the light most agreeable to the nonmovants, who are entitled to the benefit of all reasonable inferences therefrom.  Cox, 391 F.3d at 29.  Where, as here, the nonmovants have the burden of proof on the dispositive issue, they must point to "specific facts sufficient to deflect the swing of the summary judgment scythe."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation.  Pagano v. Frank, 983 F.2d 343, 347 (1st Cir. 1993); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991); cf. G.F. Northall, Folk-Phrases of Four Counties 23 (1894) (memorializing the venerable adage that "[s]ticks and stones will break my bones, but names will never hurt me").

---

[2] Rule 56 has been amended, effective December 1, 2010.  The substantive standard for summary judgment remains unchanged.  See Fed. R. Civ. P. 56 advisory committee's note.  At any rate, the version of the rule that was previously in effect controls here.

It is against the backdrop of this familiar standard that we consider the three issues that the plaintiffs purport to raise on appeal.

## A. **Discrimination in Hiring**.

In this venue, the plaintiffs narrow their disparate treatment claim. They press only one aspect of it: that their employer (through Khatib) engaged in a pro-male pattern of discriminatory hiring. This claim is easily dispatched.

The core inquiry in a gender-based disparate treatment case is whether the defendant intentionally discriminated against the plaintiff because of her gender. Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004). The plaintiff is not required to adduce direct proof of discrimination. Id. (citing U.S. Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 716-17 (1983)). She may instead take advantage of a burden-shifting framework to raise an inference of disparate treatment. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

A plaintiff who chooses to follow this path first must establish a prima facie case. The elements of the prima facie case depend upon the particular type of employment decision at issue. Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 719 (1st Cir. 1994). Adapted to the instant case, the elements of a failure-to-hire claim are: (i) that the plaintiffs are members of a protected class; (ii) that they were qualified for the position to which they aspired;

-9-

(iii) that they were not hired; and (iv) that a person possessing similar or inferior qualifications was hired. Morón-Barradas v. Dep't of Educ., 488 F.3d 472, 478 (1st Cir. 2007); Keyes v. Sec'y of Navy, 853 F.2d 1016, 1023 (1st Cir. 1988). Making this modest showing raises an inference of intentional discrimination. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

Once raised, that inference shifts the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. Id. at 254; Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990). So long as the employer comes forward with such a reason, the burden of production reverts to the plaintiffs. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999). In order to carry that burden, the plaintiffs must proffer evidence tending to prove that the reason offered by the employer was apocryphal; that is, a pretext for discrimination. Rathbun, 361 F.3d at 72. Unlike the burden of production, the burden of proving intentional discrimination never shifts; it remains with the plaintiff throughout the burden-shifting pavane. See Mesnick, 950 F.2d at 823.

In this case, the plaintiffs cannot make out a prima facie case of discriminatory hiring. Although they are members of a protected class — women — they make no effort to satisfy any of the three remaining elements needed for a prima facie case. None

of them applied — let alone applied unsuccessfully — for any open position during Khatib's tenure and, thus, none of them can maintain a failure-to-hire claim.  See, e.g., Morón-Barradas, 488 F.3d at 478; Gu v. Boston Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002).

The plaintiffs' effort to demonstrate gender-based discrimination by direct evidence is no more fruitful.  This line of attack relies on raw statistics reflecting Khatib's engagement of a cadre of predominantly male contract technologists.  Leaving to one side that these numbers lack statistical significance,[3] the plaintiffs' claim is again undone by their failure to demonstrate that the alleged discrimination affected their own employment prospects.  Put simply, the plaintiffs had jobs.  During the relevant period, none of them sought to be engaged as a contract technologist (or, for that matter, in any other new capacity).  Because Khatib did not refuse to hire any of the plaintiffs, the record presents no trialworthy issue as to discriminatory hiring.

## B.  **Retaliation**.

We turn next to the plaintiffs' retaliation claim.  Title VII makes it unlawful "for employers to retaliate against persons

---

[3] Statistical evidence "is permissible in the disparate treatment context to show that the employer's conduct conformed to a general pattern of discrimination."  Rathbun, 361 F.3d at 79. Here, however, the evidence is merely that a few more males than females were hired.  The plaintiffs provided nothing to show that this small disparity was statistically significant.  More importantly, they failed to present the figures "in a context which would lend them probative value."  Rodríguez v. Smithkline Beecham, 224 F.3d 1, 7 (1st Cir. 2000).

who complain about unlawfully discriminatory employment practices." Noviello, 398 F.3d at 88 (citing 42 U.S.C. § 2000e-3(a)). A specialized burden-shifting framework applies to retaliation claims. This framework also encompasses a prima facie case requirement. To satisfy this requirement, a plaintiff must show (i) that she engaged in protected activity; (ii) that she bore the brunt of a materially adverse action; and (iii) that the first two elements were causally linked to one another. Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 81 (1st Cir. 2007).

In this instance, the employer does not dispute that the plaintiffs' complaints about Khatib's stewardship constituted protected activity. Consequently, we combine the two remaining elements and focus the lens of our inquiry on whether the facts, taken in the light most favorable to the plaintiffs, can support a finding that they suffered some materially adverse action that was causally connected to their protected activity.

The Supreme Court has made it pellucid that the category of adverse actions sufficient to trigger Title VII's antiretaliation provision is "not limited to discriminatory actions that affect the terms and conditions of employment." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006). Unlike the substantive antidiscrimination provision of Title VII, 42 U.S.C. § 2000e-2(a), the antiretaliation provision covers all "employer actions that would have been materially adverse to a reasonable employee,"

defined as actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 57. This objective assessment "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (quotation omitted).

The principal adverse action highlighted by the plaintiffs is Khatib's proposal to abolish the four-day work schedule for CT technologists. They argue that after they griped to Dr. Sta Ines, Khatib fabricated a fictitious backlog in order to justify altering their work schedule in a punitive fashion.

This argument is all cry and no wool. Merely proposing a change in an employee's schedule does not, in and of itself, constitute a materially adverse action. See, e.g., Roebuck v. Washington, 408 F.3d 790, 794 (D.C. Cir. 2005); Grube v. Lau Indus., Inc., 257 F.3d 723, 731-32 (7th Cir. 2001). To qualify, the proposal must be brought to fruition; and here the four-day work schedule remained intact.

The plaintiffs next cite a plethora of petty indignities, which they suggest amount to materially adverse actions. They assert that Khatib derailed Parker's opportunity for CT training, reassigned Ahern and Mastalerz to the x-ray department and denied

them "call" pay, and deprived Auger of certain unofficial honorifics.[4]

Perscrutation of the plaintiffs' allegations reveals that they overstate the reality of events. To begin, Parker admitted that the delay in her training was justified. Moreover, it was temporary; Khatib agreed that she should receive the CT training once she had completed a preexisting commitment to undergo angiography training and after another female technologist had completed CT training.[5] At any rate, a minor delay in timing is not, in the circumstances of this case, significant enough to constitute a materially adverse action. See Morales-Vallellanes v. Potter, 605 F.3d 27, 38 (1st Cir. 2010).

As to Ahern and Mastalerz, the record indicates that they were assigned to the x-ray department for less than two weeks when they returned from extended medical leaves in October of 2004, that they experienced no diminution in pay or benefits, and that this temporary reassignment was due to a need for training. Indeed, Mastalerz herself acknowledged that this temporary reassignment "probably wasn't unreasonable." There is nothing to suggest, as the plaintiffs would have it, that the temporary reassignment was a

---

[4] Before the district court, the plaintiffs also alleged that Khatib unfairly reprimanded Auger and Ahern. They do not pursue these claims on appeal.

[5] While the plaintiffs argue that Khatib contributed to the delay by facilitating CT training for a male contract technologist, the record does not support that argument.

-14-

demotion or a punishment. In the absence of a labor agreement or other contractual bar, employers must be accorded reasonable flexibility in operational matters, such as shifting work assignments and arranging for the sharpening of skills. On the facts of this case, the short-term reassignments of which the plaintiffs complain cannot plausibly be said to constitute materially adverse actions. See Morales-Vallellanes, 605 F.3d at 38.

The plaintiffs' reliance on their omission from the call schedule is equally unavailing. When a technologist is on call, she is required to be available to come in after hours. Compensation is de minimis unless the technologist actually performs a procedure. Because of its income-generating potential, inclusion in the call list is a benefit of a staff technologist's position. See, e.g., Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010);[6] Noviello, 398 F.3d at 88.

In the case at hand, Ahern and Mastalerz complain that they were omitted from the call schedule for one month. That is true as far as it goes, but it does not take them very far.

The call schedule is prepared in advance, on a month-to-month basis. The record is uncontradicted that Ahern and Mastalerz were absent on sick leave (and, thus, unable to work). They were

_____

[6] While Reinhardt is a case brought under the Rehabilitation Act, not under Title VII, it relies on earlier Title VII cases for this point. See 595 F.3d at 1133.

-15-

omitted from the call schedule during that period.  They complain, however, that they also were omitted from the call schedule for October of 2004 — the month in which they returned to work.  The employer's explanation — that the timing of their return from sick leave dictated that result because that month's call schedule already had been finalized — is uncontradicted and comports with the common-sense notion that a certain amount of lead time was needed to set the roster.[7]  Moreover, the two individuals were restored to the call schedule the following month.

On these facts, we hold that this temporary interruption was not a materially adverse action.  Morales-Vallellanes, 605 F.3d at 38; Lapka v. Chertoff, 517 F.3d 974, 986 (7th Cir. 2008).

This brings us to Auger's alleged removal from two unofficial positions, "substitute lead tech" and "educational facilitator," as well as from certain x-ray duties.  To begin, these allegations are not supported by the record citations proffered by the plaintiffs.  That, in itself, rendered them insufficient to create a triable issue.  See Higgins v. New Balance Ath. Shoe, Inc., 194 F.3d 252, 261 (1st Cir. 1999); Medina-Muñoz, 896 F.2d at 8; see also D.R.I. R. 56(a)(2).

_____

[7] To be sure, the plaintiffs argue that the October 2004 call schedule could have been amended to include them.  But they point to no significantly probative evidence to support this argument.  Their self-serving speculation is insufficient to cast doubt on the legitimacy of the employer's action.  See Mesnick, 950 F.2d at 822.

In all events, the claim fails on the merits.  Auger admits that her responsibilities were never curtailed and that her compensation and benefits were not reduced.  The informal designations that she enjoyed before Khatib arrived were simply that: informal designations.  They did not carry with them any emoluments.  So viewed, the loss of these designations does not show sufficient harm to constitute a materially adverse action.  See Noviello, 398 F.3d at 88.

That ends the litany of adverse actions cited by the plaintiffs in support of their retaliation claim.  None suffices to meet the standard of material adversity that the Court has required.  See Burlington N., 548 U.S. at 68.

If more were needed — and we doubt that it is — there is a second reason why the plaintiffs' retaliation claim fails.  The plaintiffs rely on the temporal proximity of their complaints to Khatib's actions to show a causal connection between the two.  That proximity, however, is more imagined than real.

The plaintiffs' complaints were voiced during a period that ran from September of 2003 through April of 2004.  They have not shown, however, that Khatib's allegedly retaliatory actions occurred close in time to those complaints.

With respect to some of these actions, the plaintiffs do not specify when they occurred.  As to those actions — Parker's delayed training and Auger's alleged loss of her unofficial

-17-

designations — any temporal link is entirely conjectural. Conclusions that rest wholly on speculation are insufficient to defeat a motion for summary judgment. <u>Pagano</u>, 983 F.2d at 347.

The remaining actions, including the temporary reassignment and denial of call opportunities, took place in October of 2004. That was several months after the plaintiffs complained. The Supreme Court has noted that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." <u>Clark Cnty. Sch. Dist.</u> v. <u>Breeden</u>, 532 U.S. 268, 273 (2001) (internal quotation marks omitted). It follows that the interval separating the complaints and the allegedly retaliatory conduct must be capable of "support[ing] an inferred notion of a causal connection between the two." <u>Bennett</u> v. <u>Saint-Gobain Corp.</u>, 507 F.3d 23, 32 (1st Cir. 2007).

That tight fit is lacking here. Without some corroborating evidence suggestive of causation — and there is none here — a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action. <u>See</u> <u>Calero-Cerezo</u> v. <u>U.S. Dep't of Justice</u>, 355 F.3d 6, 25 (1st Cir. 2004) (noting that periods of three or four months have been held insufficient to establish the necessary causal

-18-

connection); see also Morón-Barradas, 488 F.3d at 481; Ramírez Rodríguez v. Boehringer Ingelheim Pharms. Inc., 425 F.3d 67, 85 (1st Cir. 2005). The bottom line is that when the interval between a complaint and the alleged retaliation is attenuated, chronological data, by itself, does not forge the causal link needed to establish a prima facie case of retaliation. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997). This is such a case.

At the expense of carting coal to Newcastle, we also note that the employer has articulated a legitimate, nondiscriminatory reason for each of the challenged actions. The plaintiffs, for their part, have adduced no significantly probative evidence tending to show that the proffered reasons were a pretext masking a retaliatory animus. This, in itself, might well be enough to warrant summary judgment for the employer on the retaliation claim. See Higgins, 194 F.3d at 262.

### C. **Constructive Discharge**.

Finally, the plaintiffs contend that the poor treatment they received at Khatib's hands forced them to leave the DVA. In the court below, they offered only a terse, wholly conclusory allegation in support of this contention. Both the magistrate judge and the district judge concluded that the plaintiffs had waived the claim through their failure to develop it, but both judges

nonetheless proceeded to reject the claim on the merits.  Ahern, 2009 WL 1615402, at *7, *21.

In this court, the plaintiffs do not address the finding of waiver.  Rather, they make a merits-based argument — but not an argument that they made below.  In this newly minted argument, they attempt to substantiate the constructive discharge claim through references to (i) the September 2004 report compiled by the DVA review team and (ii) the fact that several employees took extended stress leave during Khatib's reign.

An appellant cannot change horses in mid-stream, arguing one theory below and a quite different theory on appeal.  See, e.g., Tasker v. DHL Ret. Sav. Plan, 621 F.3d 34, 40 (1st Cir. 2010); Clauson v. Smith, 823 F.2d 660, 666 (1st Cir. 1987).  The plaintiffs have done violence to this principle and, therefore, have waived (or, at least, forfeited) their constructive discharge claim.

We need not probe this point too deeply because, in the final analysis, the claim fails on the merits.  Title VII does not create a general civility code for the workplace.  Burlington N., 548 U.S. at 68; Ríos-Jiménez v. Principi, 520 F.3d 31, 44 (1st Cir. 2008).  Consequently, a plaintiff who seeks to withstand summary judgment on a claim of constructive discharge must point to evidence in the record showing that, as a result of discrimination, her "working conditions were so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign."

<u>Marrero</u> v. <u>Goya of Puerto Rico, Inc.</u>, 304 F.3d 7, 28 (1st Cir. 2002) (quotation omitted); <u>accord</u> <u>Suárez</u> v. <u>Pueblo Int'l, Inc.</u>, 229 F.3d 49, 54 (1st Cir. 2000).

The DVA review team's report does not help the plaintiffs to make this showing. Although the report concluded that Khatib's management style left much to be desired and that his actions had created divisiveness and unrest among employees who worked under him, it made clear that he had not engaged in discriminatory practices. By the same token, the plaintiffs' vague and conclusory allegations tend to show — insofar as they show anything — that Khatib's conduct may have engendered a nerve-wracking environment, but not a nerve-wracking environment <u>based</u> <u>on</u> <u>gender</u>. Viewing the evidence in the light most favorable to the plaintiffs, it indicates only that Khatib was an inefficient manager lacking in interpersonal skills.

Toiling under a boss who is tough, insensitive, unfair, or unreasonable can be burdensome, but Title VII does not protect employees from the "ordinary slings and arrows that suffuse the workplace every day." <u>Smith</u> v. <u>F.W. Morse & Co.</u>, 76 F.3d 413, 425 (1st Cir. 1996). Nevertheless, generally disagreeable behavior and discriminatory animus are two different things.

Absent some showing that gender-based discrimination polluted the workplace, the plaintiffs' constructive discharge claim must fail. <u>See</u> <u>Wagner</u> v. <u>Devine</u>, 122 F.3d 53, 55 n.4 (1st Cir.

-21-

1997) (explaining that "a finding of constructive discharge . . . require[s] some showing that the challenged conduct actually was attributable to the alleged discrimination"); see also Carter v. George Washington Univ., 387 F.3d 872, 883 (D.C. Cir. 2004); Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718 (3d Cir. 1997).

We add that, notwithstanding the plaintiffs' repeated references to employees taking stress leaves, the work environment that they depict, though far from ideal, was not so difficult or noxious that a reasonable person would have felt compelled to resign. Roman v. Potter, 604 F.3d 34, 42 (1st Cir. 2010); Suárez, 229 F.3d at 54-55. Indeed, the vast majority of the employees who worked under Khatib, male and female, were subjected to the same treatment and chose to stay. This fact underscores the absence of any foundation for a claim of constructive discharge. See Greenberg v. Union Camp Corp., 48 F.3d 22, 28 (1st Cir. 1995).

## III. CONCLUSION

We need go no further. The district court appropriately concluded that the plaintiffs had not produced sufficient evidence to survive summary judgment on any of their claims. Consequently, we uphold its entry of summary judgment.

**Affirmed**.