# United States Court of Appeals
# For the First Circuit

No. 13-2133

RAYMOND MURRAY,

Plaintiff, Appellant,

v.

WARREN PUMPS, LLC and COLFAX AMERICAS,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Lipez, Circuit Judges.

Michael O. Shea, with whom Law Office of Michael O. Shea, P.C. was on brief, for appellant.
Mark W. Batten, with whom Elizabeth A. Kowal and Proskauer Rose LLP were on brief, for appellees.

April 25, 2016

HOWARD, **Chief Judge**.  Plaintiff Raymond Murray sued his former employer Warren Pumps, LLC and its parent company Colfax Americas, claiming that their actions toward him violated the Americans with Disabilities Act ("ADA") and its Massachusetts analog.  42 U.S.C. §§ 12112(a), (b)(5)(A); M.G.L. ch. 151B, § 4(16).  He also asserted a state common law claim that he had been terminated from his employment for raising complaints about suspected workplace safety violations, in contravention of Massachusetts public policy.  The district court granted summary judgment in favor of the defendants on all claims.  We affirm.

## I.

Given the summary judgment posture, we recite the facts in the light most favorable to Murray as the non-moving party. See Henry v. United Bank, 686 F.3d 50, 54 (1st Cir. 2012).  Warren Pumps manufactures pumps for both the commercial market and for purchase by the government for use in sophisticated end products such as submarines.  Murray's job responsibilities for Warren Pumps primarily encompassed ensuring that workplace practices in the plant complied with health and safety requirements.  When Warren Pumps first hired Murray in 2003, the company knew that he had physical limitations related to a permanent back condition.  Specifically, Murray was restricted from lifting items over 35

- 3 -

pounds and from standing or sitting for long periods of time. In light of this knowledge, the company and Murray agreed that he would perform his job in a manner that accommodated his limitations as needed. Although Murray believed that his supervisor did not always abide by this agreement, he left Warren Pumps in 2005 simply to pursue another employment opportunity.

In 2008, Murray was recruited back to Warren Pumps by his former supervisor Matt Korzec, and he resumed his prior duties of monitoring workplace safety. Although his physical limitations largely remained the same, his lifting restriction now was capped at 10 pounds. Additionally, Murray was restricted from extended walking, standing and sitting, from climbing ladders, and from using certain hand tools. The company knew of these restrictions when it rehired Murray and also knew that periodically he would need time off to attend medical appointments. As before, the parties did not expect Murray to tax his physical limitations while performing his normal job responsibilities. Therefore, they again agreed that Murray should self-monitor his workplace activities and accommodate his back condition as necessary when doing his job.

Throughout his second term of employment, Murray again reported many workplace safety violations pursuant to his job

duties. He was, however, often dissatisfied with Korzec's decisions about whether and how to rectify reported problems. Murray also disliked that Korzec sometimes requested him to take on tasks involving some measure of physical labor. To Murray, many of the requested tasks conflicted with his physical restrictions. On occasion Murray voiced an objection, but many times he did not.

In the spring of 2011, Murray decided to take his complaints about workplace safety to the company's headquarters. He alerted the company about the practices of a welder at the plant who, Murray alleged, had been using a "vertical and overhead" position without proper certification for doing so. Murray also reported that Korzec had been "breaking laws" and had allowed "unapproved repairs to castings to the [Department of Defense's] and customers['] equipment." He urged the company to "[d]o a little research and see how many castings or screws have failed and how many were repaired on weekends [w]ith no inspection people around." Within a week, Greg Miller, the vice president of quality for defendant Colfax, met with Murray to discuss his concerns about the welding practices. As a result, Miller reviewed the particular welder's time cards and customer files but discovered nothing to substantiate Murray's complaints.

Murray's employment with Warren Pumps ended on June 1, 2011. During a meeting with him that day, Crystal Baker, the vice president of human resources, and Brian Mills, the vice president of manufacturing, told Murray that he seemed "unhappy" working at Warren Pumps. They presented him with two options for separation: a severance package or a six-week sunset term. Murray accepted neither, and he was terminated. Murray, in turn, filed this action alleging federal and state disability discrimination claims and a state wrongful discharge claim. After discovery, the defendants secured summary judgment on all counts. See Murray v. Warren Pumps, LLC, No. 11-40176-DPW, 2013 WL 5202693 (D. Mass. Sept. 12, 2013). This timely appeal followed.

## II.

We review de novo the district court's decision to award the defendants summary judgment. Henry, 686 F.3d at 54. A moving party is to be spared a trial when there is no genuine issue of any material fact on the record and that party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986). Where a defendant's motion for summary judgment demonstrates "an absence of evidence to support the nonmoving party's case," Celotex, 477

U.S. at 325, the plaintiff must adduce specific facts showing that a trier of fact reasonably could find in his favor, Anderson, 477 U.S. at 249-50. Conclusory allegations, improbable inferences, and unsupported speculation will not make the grade. See Celotex, 477 U.S. at 323-24; Pina v. Children's Place, 740 F.3d 785, 795-96 (1st Cir. 2014). The party's allegations must find adequate support in the record. See Celotex, 477 U.S. at 323-24; Pina, 740 F.3d at 796.

## III.

The ADA prohibits an employer from discriminating against an otherwise qualified individual based on a real or perceived disability. 42 U.S.C. § 12112; see id. § 12102; 29 C.F.R. § 1630.2; see also Farris v. Shinseki, 660 F.3d 557, 562 (1st Cir. 2011); Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 112 (1st Cir. 2006). The plaintiff bears the burden of presenting evidence to establish each element under the particular theory of disability discrimination alleged. See Lebron v. Commonwealth of Puerto Rico, 770 F.3d 25, 31 (1st Cir. 2014); Faiola v. APCO Graphics, Inc., 629 F.3d 43, 47 (1st Cir. 2010); Quiles-Quiles v. Henderson, 439 F.3d 1, 6-7 (1st Cir. 2006). Massachusetts has comparable prescriptions. See M.G.L. ch. 151B § 4(16); see also Godfrey v. Globe Newspaper Co., 928

- 7 -

N.E.2d 327, 333-38 (Mass. 2010); Dartt v. Browning-Ferris Indus., Inc., 691 N.E.2d 526, 528, 530-33 (Mass. 1998); Tate v. Dep't of Mental Health, 645 N.E.2d 1159, 1165 (Mass. 1995).

Murray advances three distinct theories of disability discrimination:  failure to provide reasonable accommodations, disability harassment, and retaliatory discharge.  Our careful review of the record confirms the district court's assessment that Murray cannot establish a prima facie case on any of his three theories.  We address each in turn, evaluating the ADA and state analog claims in tandem given their substantive overlap in this case.  See Henry, 686 F.3d at 58-59.  We proceed on the assumption that the evidence allows for a finding that Murray has a qualifying handicap or disability under state and federal law.

**A.**

An employer must make "reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A). Reasonable accommodations are modifications or adjustments to the work environment, or to the manner in which the position's duties are customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position. See 29 C.F.R. § 1630.2(o).  An employer is obligated to provide a

- 8 -

reasonable accommodation (as long as it is not unduly burdensome) where a protected employee has requested an accommodation or the employer otherwise knew that one was needed. See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012). The employee's request for an accommodation, however, "must be sufficiently direct and specific, and it must explain how the accommodation is linked to the [employee's] disability" in order to trigger the employer's responsibility to accommodate. Id.; see Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 808 N.E.2d 257, 267-68, 270-71 (Mass. 2004).

In his complaint, Murray alleged that he had requested "time off and other accommodations for his disability, such as light duty, lifting restrictions, and to take breaks in order to raise his legs/feet, and for time off for medical treatment," but that Warren Pumps "denied some of those requests." Thus, to resurrect his failure to accommodate claim, Murray must point to evidence in the record allowing a rational jury to find that he requested an accommodation (or that Warren Pumps had reason to know of his need for one) but that Warren Pumps refused reasonably to accommodate him. See Jones, 696 F.3d at 89. This he has failed to do.

We start by clearing some underbrush: we set aside those portions of Murray's deposition testimony that only broadly suggest requests for accommodation. For example, he generally testified that he sought breaks from "time to time," without detailing any particular occasions or explaining whether and how Warren Pumps actually denied any such requests. This vague and incomplete testimony has little evidentiary value. See Celotex, 477 U.S. at 323-24; Pina, 740 F.3d at 795-96.

Much of the remainder of Murray's deposition testimony is similarly murky. He does identify some isolated instances when Korzec asked him to perform tasks involving manual labor that Murray viewed as conflicting with his medical restrictions. Murray's own description of the events, however, conclusively shows that he failed to alert Korzec to his need for an accommodation on these occasions, and that when he did speak up, Korzec did not compel him to perform the manual labor. A few illustrations will suffice.

Murray testified that, sometime in 2010, Korzec required everyone to be involved in a shop-wide painting project. Murray told Korzec that he was unable to do the work. Korzec, apparently irritated, "walk[ed] away." But Murray readily acknowledged in his deposition that Korzec did not tell him "to

go back and paint," and that he did not do so. Such an incident cannot support a finding that the company refused a request for an accommodation.

Murray also described an occasion sometime in 2011 when Korzec asked him to perform a wiring job. When Murray told Korzec that he was physically unable to do the work, Korzec told Murray to "get it done somehow." Murray accomplished the job by "pull[ing] somebody else off the floor to do it." He also personally participated to some degree by carrying a toolbox in excess of ten pounds. To the extent that it can be said that Murray asked for an accommodation on this occasion, there is no evidence that Korzec pressured Murray to perform the physical labor himself. Instead, Murray -- with Korzec's apparent acquiescence -- used another employee to complete the task. Moreover, there is no evidence that would allow a finding that Warren Pumps was responsible for Murray's personal decision to violate his lifting restriction.

On another occasion, Korzec asked Murray to oversee a project that involved extended walking between both ends of the large production facility. This time, however, Murray did not inform Korzec of his need for an accommodation to curb any excessive walking that day. During his deposition, Murray

explained that Korzec was unavailable at the time because he had already left the premises for the day. Yet, Murray conceded that he made no effort to tell anyone at the facility that he needed help with the task. Without a request for an accommodation, the company, in the circumstances of this case, cannot be faulted for failing to provide one.

Murray argues that the viability of his claim does not require evidence that he actually asked for an accommodation when Korzec instructed him to perform a strenuous task, or that Korzec actually compelled him to violate his medical restrictions on any particular occasion. It is enough, Murray contends, that Korzec "deliberately requested" that he perform tasks that would cause him "to violate his medical restrictions and accommodations granted by Warren Pumps." Whether or not this position might be tenable under other circumstances, it is unavailing in this case. See generally Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 n.7 (1st Cir. 2001) (stating that different rules may apply when the "employee's need for an accommodation is obvious").

An otherwise qualified employee with a disability who may need differing accommodations at different times (depending on his physical restrictions and varying job duties) will not be protected under the law when he fails to alert his employer that

a particular task requested of him conflicts with a medical restriction. See Enica v. Principi, 544 F.3d 328, 339-40 (1st Cir. 2008); Reed, 244 F.3d at 260-61; see also E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 133-34 (1st Cir. 2014) (discussing mutual responsibilities for the interactive process). "The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace," Reed 244 F.3d at 261, or simply relies on the employer's general awareness of his need for accommodations where the purported conflict with a medical condition in particular situations is not obvious, Enica, 544 F.3d at 339-40. See also Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1063-66 (Mass. 2002) (summary judgment appropriate where the record established that the accommodations were "never requested or even suggested by the plaintiff").

Warren Pumps and Murray together established the boundaries of a reasonable accommodation from the outset of his second term of employment in 2008. Murray agreed to self-monitor whether certain tasks were stressing his physical abilities, and to make appropriate adjustments himself or request accommodation. Although he insists throughout his deposition testimony that Korzec already "knew" of his restrictions, Murray makes no effort

- 13 -

to account for the self-directed and discretionary nature of his mutually agreed accommodation. Nor does he account for the undisputed fact that Korzec was in charge of supervising fifty-five to sixty people on a regular basis.

Instead, the undisputed facts presented in the sufficiently detailed parts of Murray's deposition testimony show that when he did specifically inform Korzec of his need to make adjustments or to decline to do a task, Korzec did not push him to perform the job personally. Furthermore, by Murray's account, Warren Pumps accommodated many of his specific directives whether or not they were related to his back condition. Examples include Murray's request for time off in order to attend medical appointments, for help with lifting cables, and for changes to his work schedule.

In the end, we are left with a record in which Murray himself simply assumed that Korzec's actions were "deliberate" requests to violate his medical restrictions, and the evidence proffered either fails to support or affirmatively belies his subjective assumption. Cf. Pilgrim v. Trustees of Tufts Coll., 118 F.3d 864, 871 (1st Cir. 1997) (noting that a plaintiff's "perception is not evidence" of employment discrimination, and, hence, "not enough to withstand summary judgment"). In the

- 14 -

circumstances of this case, Warren Pumps cannot be faulted, as a matter of law, either when Murray opted to remain silent or when he voluntarily chose to participate in certain activities, or when he otherwise failed to police his own physical needs (as the parties had agreed).  See Enica, 544 F.3d at 339-40; Reed, 244 F.3d at 261.

Accordingly, we affirm the district court's decision to award summary judgment to the defendants on the failure to accommodate claims.

## B.

Murray has also pursued a claim for disability harassment under a hostile work environment theory.[1]  To succeed, a hostile work environment claim requires, in addition to proof of other elements, evidence that the discriminatory conduct was "sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment."  Ponte v.

---

[1]  See Quiles-Quiles v. Henderson, 439 F.3d 1, 5 n.1, 7 (1st Cir. 2006) (assuming that disability harassment under a hostile work environment theory is a viable ADA claim); Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 43-44 (1st Cir. 2011) (citing to Quiles-Quiles to apply hostile work environment theory under ADA).  But see Rocafort v. IBM Corp., 334 F.3d 115, 120 (1st Cir. 2003) (declining to decide whether "hostile work environment claims exist under the ADA"); see also Barton v. Clancy, 632 F.3d 9, 20 n.7 (1st Cir. 2011) ("The SJC has not specifically confirmed that Massachusetts recognizes a claim for a hostile work environment based on handicap under ch. 151B, § 4(16).").

- 15 -

Steelcase Inc., 741 F.3d 310, 320 (1st Cir. 2014) (internal quotation marks omitted); see Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005) (outlining various requirements for a retalitory hostile work environment sexual harassment claim); see also Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 937 (Mass. 2001) (similar standard). Such a claim is not factually viable on this record.

In his complaint, Murray averred that he was subject to "harassment" and "treated differently" based on "his real or perceived disability and medical condition" and was "severely and adversely affected by the Defendants' conduct and [their failure] to take reasonable steps to ensure that the discriminatory conduct and harassment would not continue." His harassment claims rest on comments and conduct by Korzec and by Nicole Belechto, a corporate recruiter for Colfax.

First, he points to "snide comments" that Korzec made to him when Murray was unable to perform certain tasks. For example, Korzec told him that he "could work faster," that he might accomplish more if he were at the shop more, and that "a younger person could do [the task] very easily." However, Murray's rather generic deposition testimony ended there. He did not tie Korzec's statements to any particular event or otherwise

provide surrounding details to place the remarks in context. In fact, Murray acknowledged that he could not even identify when Korzec made any such comments, other than generally stating that they occurred sometime in 2011. Accordingly, Korzec's statements fit into the category of isolated, stray remarks whose substance and frequency cannot provide adequate foundation for a hostile work environment claim. Cf. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks and citation omitted)).

Next, Murray avers that the "questioning" that he endured from Korzec and Belechto about his need for time off for medical appointments constitutes harassment. As the district court emphasized, however, Murray provided no evidence tending to show that these inquiries by his supervisor and by the human resources officer "fell outside the appropriate and necessary duties of their jobs." Murray, No. 11-40176-DPW, 2013 WL 5202693, at *18. Indeed, our own review of Murray's somewhat muddled testimony leaves us uncertain whether the nature of the company's inquiries even related to his back condition at all. See Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010) ("[G]enerally

- 17 -

disagreeable behavior and discriminatory animus are two different things.").

All told, these minor instances of employment skirmishes cannot ground Murray's hostile work environment claims.[2] Therefore, the district court's ruling in favor of the defendants on this theory of relief must be upheld.

## C.

Murray's final disability theory is retaliatory discharge. The ADA and its state analog both forbid an employer from retaliating against a protected employee when that employee engages in protected activity. See Lebron, 770 F.3d at 31; Tate, 645 N.E.2d at 1165. Murray averred in his complaint that the company's decision to terminate him on June 1, 2011 was motivated at least in part by his requests for reasonable accommodations and by his complaints about harassment. Such conduct by Murray would be protected activity. See Valle-Arce v. P.R. Ports Auth., 651 F.3d 190, 198 (1st Cir. 2011); Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003); see also Tate, 645 N.E.2d at 1165; cf. Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d

---

[2] In his brief, Murray also attributes to Belechto a specific remark disparaging disabled persons. But this factual averment is insufficiently developed in the summary judgment record.

1075, 1087 (Mass. 2000).  But a successful retaliation claim also requires proof that, among other things, there was a causal connection between the protected activity and the adverse action taken by the employer.  See Lebron, 770 F.3d at 31.  When, as now, an employee relies solely on a chronological relationship between the protected activity and later termination to support "an inferred notion of a causal connection between the two," "the temporal proximity must be very close."  Ahern, 629 F.3d at 58 (internal quotation marks omitted).  Murray's claim stumbles at this step.

Murray's more definite requests for accommodation, one in 2008 when he was rehired, and arguably one in 2010 when he declined to assist in a shop-wide painting project, are too remote from the decision to terminate his employment in June 2011.  For that reason, they do not constitute useful evidence of the required nexus.  See id. ("[W]hen the interval between a complaint and the alleged retaliation is attenuated, chronological data, by itself, does not forge the causal link needed to establish a prima facie case of retaliation.").

Murray's resistance to the wiring job sometime in 2011 also provides an insufficient basis to infer a nexus.  See id. (holding that the lack of evidence specifying when material events

- 19 -

occurred renders "any temporal link . . . entirely conjectural"); see also Mole v. Univ. of Mass., 814 N.E.2d 329, 339 (Mass. 2004). And Murray's assertion that he made numerous requests for accommodations after March 2011 when he returned to a full-time work schedule lacks support in the record. For the reasons earlier discussed, all of the times that Murray stayed silent when Korzec asked him to perform a task that he saw as conflicting with his medical restrictions do not amount to protected activity on this record. This is especially so since Murray himself testified that he and Korzec only spoke "maybe three times" during the last six months of his employment.

Turning to whether Murray can establish a nexus between his complaints about disability harassment and the alleged retaliation, the record shows that he told a human resources employee in June or July of 2010 that he had been "hired with certain restrictions and that . . . [Korzec] didn't care." He also testified that he made some complaints (generally left undescribed) to Belechto in 2010. As best we can tell, these isolated complaints occurred six months to a year prior to his termination, which is too remote in time from the adverse employment action to establish a retaliation nexus on this record. See generally Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6,

25 (1st Cir. 2004) (periods of three or four months have been held insufficient to establish the necessary causal connection for a prima facie case of retaliation). Each instance of protected activity to which Murray points lacks a temporal connection to the adverse action against him. See Ahern, 629 F.3d at 58.

We also note that there is a lack of evidence that the two company vice presidents who met with Murray and took personnel action against him had knowledge of his protected activity. The district court record is bereft of evidence that Murray established or even pressed that either Baker or Mills had such knowledge. See Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 85 (1st Cir. 2006) (emphasizing the necessity of the decision-maker's knowledge); Mole, 814 N.E.2d at 343-44 (same).

Accordingly, we affirm the district court's decision to grant summary judgment in favor of the defendants on the retaliation claims as well.

There is one more stone to turn in addressing the accommodation, harassment, and retaliation claims in this case. On appeal, Murray mentions ailments related to a 2010 car accident. The district court ruled that the temporary and isolated "new" ailments tied to the car accident (e.g., whiplash, right leg pain, and headaches) that Murray identified for the

first time during his deposition could not form a foundation for either a state or federal disability discrimination claim.  See Murray, No. 11-40176-DPW, 2013 WL 5202693, at *5.  Despite scattered references to his car accident injuries throughout his appellate brief, Murray describes his disability as solely based on his "more permanent back impairment" -- which is in line with his complaint.  In his reply brief, however, Murray attempts to challenge the court's decision limiting his putative disability to his back condition alone.  His delayed advocacy, first raised in his reply brief, warrants no judicial review.  See Butler v. Deutsche Bank Trust Co. Americas, 748 F.3d 28, 36 (1st Cir. 2014).

## IV.

This leaves Murray's attempt to resurrect his state common law claim for wrongful termination.  In his complaint, Murray alleged that Warren Pumps retaliated against him for reporting to management serious safety concerns that he believed amounted to violations of federal or state law.  We, however, agree with the district court that Murray failed to carry his burden of establishing that his termination implicates a sufficiently important and clearly defined public policy in Massachusetts.

The baseline common law rule in Massachusetts is that an employer may lawfully terminate a relationship with an at-will

employee at any time -- for any reason, for no reason, and even for a reason that might be seen by some as unwise or unkind. See Upton v. JWP Businessland, 682 N.E.2d 1357, 1358-59 (Mass. 1997); King v. Driscoll, 638 N.E.2d 488, 492-93 (Mass. 1994). As a narrow exception, the Commonwealth protects at-will employees from terminations that conflict with sufficiently important and clearly defined public policies in Massachusetts. See King, 638 N.E.2d at 493; Wright v. Shriners Hosp. for Crippled Children, 589 N.E.2d 1241, 1244 (Mass. 1992); Mello v. Stop & Shop Cos., Inc., 524 N.E.2d 105, 106 (Mass. 1988). However, not all statutes relating to an employer's discharge decision are pronouncements of public policy that "will protect, in every instance, an [at-will] employee from termination." King, 638 N.E.2d at 493. Indeed, Massachusetts courts "have acknowledged very few statutory rights the exercise of which would warrant invocation of the public policy exception." Id. Thus far, the state's highest court has held that "[r]edress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury)." Smith-Pfeffer v.

Superintendent of the Walter E. Fernald State Sch., 533 N.E.2d 1368, 1371 (Mass. 1989).

Beyond these categories, legal redress may be available "in certain circumstances for employees terminated for performing important public deeds, even though the law does not absolutely require the performance of such a deed." Flesner v. Technical Commc'ns Corp., 575 N.E.2d 1107, 1111 (Mass. 1991). This limited extension of the public policy exception aligns with the Smith-Pfeffer categories because "allowing the employer to terminate employees for reasons that directly contradict the public policy of the Commonwealth would seriously impair that policy." Id.; see Upton, 682 N.E.2d at 1358-59. By contrast, the public policy exception does not protect at-will employees from termination for performing generally socially desirable duties or for raising workplace complaints about internal company matters. See, e.g., Wright, 589 N.E.2d at 1245 (state law does not extend the public policy exception "to protect employees who were performing 'appropriate, socially desirable duties' from being subject to discharge without cause"); King, 638 N.E.2d at 492 (state law establishes that "the internal administration, policy, functioning, and other matters of an organization cannot be the

basis for a public policy exception"); see also Upton, 682 N.E.2d at 1358-59 (collecting cases).

The burden lies with the at-will employee to establish that the substance of his workplace complaints for which he was discharged bears a direct connection to a sufficiently important and clearly defined public policy that warrants his protection from termination. See Mello, 524 N.E.2d at 107; Falcon v. Leger, 816 N.E.2d 1010, 1019 (Mass. App. Ct. 2004). And, "[i]t is a question of law for the judge to decide whether a retaliatory firing [of an at-will employee] in [given] circumstances would violate public policy." Wright, 589 N.E.2d at 1243.

Taking our cue from Murray's pleadings in the district court, we focus primarily on his reports in the spring of 2011 about unsafe welding practices during the manufacturing of the pumps. See Mole, 814 N.E.2d at 341 (requiring a close temporal connection for an inference of a retaliatory nexus). As noted earlier, because he was generally dissatisfied with Korzec's responses to his safety complaints, Murray brought his welding concerns directly to corporate headquarters. The substance of the alleged safety violations was that a welder was following an uncertified protocol and that unapproved repairs were being made on weekends. According to the undisputed evidence, Miller, a

- 25 -

quality control executive, listened to Murray's complaints, conducted an internal investigation, and found the complaints to be unsubstantiated. This same executive explained during his deposition that the pumps undergo multiple inspections after the manufacturing process in order to detect faulty parts before those parts are used in end products.

With this evidentiary backdrop, Murray attempts to align himself with the prevailing plaintiffs in Mercado v. Manny's T.V. & Appliance, Inc., 928 N.E.2d 979 (Mass. App. Ct. 2010), and Falcon v. Leger, 816 N.E.2d 1010 (Mass. App. Ct. 2004).[3] But their similarities with Murray's circumstances begin and end with the existence of licensure requirements for trade work and of regulations governing product safety. Indeed, the plaintiffs in both Mercado and Falcon had presented evidence that they were fired for refusing to participate in unlawful or deceptive conduct that directly compromised public safety. See, e.g., Mercado, 928

_____

[3] Murray also relies on Hobson v. McClean Hosp. Corp., which is helpful only insofar as it sets forth the general legal proposition that employees who are fired for enforcing safety regulations for which they are responsible may pursue a claim for wrongful discharge under the public policy exception. 522 N.E.2d 975, 977-78 (Mass. 1988). The Hobson court merely allowed the complaint to survive a motion to dismiss, nothing more. We face a summary judgment disposition in which Murray has had plenty of opportunity to present a sound basis for protection under the narrow public policy exception.

- 26 -

N.E.2d at 984-85 (identifying evidence that the employee was fired after refusing to perform unlicensed installations of appliances in violation of municipal regulations directly implicating public safety in residential homes); Falcon, 816 N.E.2d at 1015-19 (identifying evidence that the employee was fired after refusing to deceive an on-site safety inspector by covering up faulty electrical products which directly compromised consumer safety).

By contrast, Murray presents no evidence that Warren Pumps asked him to deceive anyone about the legality of the company's conduct or fired him for refusing to engage in conduct tantamount to fraud or known illegalities. There also is no evidence that anyone at Warren Pumps attempted to subvert Murray's performance of his job as safety compliance officer in order to mask the company's suspected illegal conduct. Nor is there evidence that Murray's welding complaints directly implicated public health and safety, particularly given the undisputed testimony that all aspects of the company's pumps were regularly subjected to rigorous safety inspections designed to reveal flaws that would compromise public safety. Cf. King, 638 N.E.2d at 493 (emphasizing that remoteness between employee's complaints of corporate conduct and the impact on public safety foreclosed relief under the public policy exception); Mistishen v. Falcone

Piano Co., Inc., 630 N.E.2d 294, 296 (Mass. App. Ct. 1994) (similar analysis).

Writ large, Murray's circumstances align better with Massachusetts cases in which the state court held that an at-will employee -- with perhaps laudable expectations for workplace practices -- was discharged lawfully for performing general socially desirable duties or for disagreeing with internal company matters. In Smith-Pfeffer, for instance, the state court held the public policy exception did not protect an employee for her actions in opposing management policies and organizational issues that she saw as potentially compromising the care of the mentally impaired residents. 533 N.E.2d at 1371-72. And in Wright, the court held that it was not an actionable violation of a well-defined public policy to discharge a director of nursing for repeatedly reporting to the hospital's national headquarters managerial deficiencies that she saw as potentially compromising the quality of patient care. 589 N.E.2d at 1244-45. Along the way, the state court has been clear that "[a]n employee, even one in a socially important occupation, who simply disagrees with her

28

employer's policy decisions, may not seek redress in the courts." Smith-Pfeffer, 533 N.E.2d at 1372.[4]

Even broadening the lens to other workplace complaints that Murray raised in the time frame immediately prior to his termination does not help him. Murray cites a hodgepodge of miscellaneous state laws, federal regulations, and professional standards to anchor his argument that his termination for raising these sundry complaints violates sufficiently important and clearly defined public policy. He provides, however, no cases showing that Massachusetts courts have ever relied on federal authority as the sole source for the state common law wrongful discharge claim. See Upton, 682 N.E.2d at 1359; Flesner, 575 N.E.2d at 1111. Additionally, many of the federal regulations and state statutes remain decidedly unrelated to, or have no more than a general connection to, the particular substance of certain workplace complaints that he described. See, e.g., 29 C.F.R. § 1910.253(a)(4); M.G.L. ch. 143, § 3L; id. ch. 141, § 5. And,

---

[4] Importantly, Massachusetts courts recently have emphasized that the viability of an at-will safety compliance officer's wrongful discharge claim may depend on evidence that the reported workplace violations involved a fairly imminent threat to public health or safety. See Nelson v. Anika Therapeutics, Inc., No. 09-03231-A, 2011 WL 4056320, at *7-8 (Mass. Super. Ct. Aug. 12, 2011); Chernov v. Home Depot, Inc., No. 09-P-1567, 2010 WL 4178937, at *2 (Mass. App. Ct. Oct. 26, 2010) (unpublished opinion). Evidence of such imminence is lacking here.

Murray fails to explain how professional standards embody a well-defined public policy in the Commonwealth. See Wright, 589 N.E.2d at 1245. Overall, Murray's bare citation to various legal requirements is insufficient advocacy to warrant appellate review. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); cf. King, 638 N.E.2d at 493-94 (the existence of a statute relating to a termination decision does not necessarily give rise to a cognizable wrongful termination claim).

To sum up, Massachusetts courts recognize limitations on the protection afforded to at-will employees under the public policy exception. And the Massachusetts cases warn that the public policy exception is purposely circumscribed, so that the general rule preserving employer prerogative does not morph into an edict requiring just cause to terminate an at-will employee. See, e.g., King, 638 N.E.2d at 492; Mercado, 928 N.E.2d at 983. Because the district court adhered to the line drawn in the state court decisions, its ruling on the common law claim also stands.

**AFFIRMED.**