**PHYSICIAN'S HEALTHSOURCE, INC., Plaintiff,**

v.

**VERTEX PHARMACEUTICALS INCORPORATED, et al., Defendant.**

**Civil Action No. 15–11517–JCB**

United States District Court, D. Massachusetts.

Signed 03/28/2017

Alan L. Cantor, Swartz & Swartz, Boston, MA, Brian J. Wanca, Ross M. Good, Ryan M. Kelly, Wallace C. Solberg, Anderson & Wanca, Rolling Meadows, IL, Glenn L. Hara, Rolling Meadows, IL, Matthew E Stubbs, Montgomery, Rennie & Jonson, Cincinnati, OH, Alec S. Pine, Governo Law Firm LLC, Boston, MA, for Plaintiff.

Kevin M. McGinty, Amanda B. Carozza, Claire S. Schneider, Jane T. Haviland, Peter D. McCarthy, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC, Boston, MA, for Defendant.

---

**1.** On November 19, 2015, the parties consented to the jurisdiction of a magistrate judge for

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT [Docket Nos. 72, 75, 79, 109, 111]

JENNIFER C. BOAL, United States Magistrate Judge

In this putative class action, plaintiff Physician's Healthsource, Inc. ("PHI") alleges violations of the Telephone Consumer Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 8227 (the "TCPA"). Specifically, PHI alleges that three faxes it received from the defendants constitute "unsolicited advertisements" in violation of the TCPA and seeks to represent a nationwide class of all persons who allegedly received similar faxes. All parties have filed motions for summary judgment. Docket Nos. 72, 75, 79.[1] For the following reasons, this Court denies the motions.

## I. PROCEDURAL BACKGROUND

On April 6, 2015, PHI filed this action on behalf of itself and others similarly situated. Docket No. 1. PHI also filed a motion for class certification, which the Court denied without prejudice on December 7, 2015. Docket Nos. 2, 58.

On July 29, 2016, PHI and defendants Vertex Pharmaceuticals Incorporated ("Vertex") and Tactical Advantage Group, LLC ("TAG") filed cross-motions for summary judgment. Docket Nos. 72, 75, 79. The parties filed oppositions to each other's motions for summary judgment on August 26, 2016. Docket Nos. 91, 93, 96, 97. The parties filed replies on September 9, 2016. Docket Nos. 103, 105, 106, 107. The Court heard oral argument on March 7, 2017.

all purposes. Docket No. 45.

## II. FACTUAL BACKGROUND

### A. Scope Of The Record

█ In order to determine precisely which materials are properly before the Court for purposes of deciding the cross-motions for summary judgment, the Court must first decide Vertex's motions to strike certain portions of the summary judgment record. First, Vertex moves to strike the affidavit of Alicia Scutari Salerno (the "Salerno Affidavit"), which was submitted by TAG in support of its motion for summary judgment. Docket No. 109. Vertex argues that the Salerno Affidavit must be stricken from the record because it contradicts the testimony of Stephen Taglienti, TAG's Rule 30(b)(6) designee. Id.

█ . "When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir. 1994) (citations omitted). "The purpose of this sham affidavit rule is to protect the procedural integrity of summary judgment." Mahan v. Boston Water & Sewer Comm'n, 179 F.R.D. 49, 53 (D. Mass. 1998). "If a party simply could offer a contradictory, post-deposition affidavit to defeat summary judgment without providing a 'satisfactory explanation' for the contradiction, the purpose of summary judgment would be defeated." Id. (citing Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2nd Cir. 1969)).

█ However, "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 26 (1st Cir. 2002). The Court has reviewed the subject documents and finds that the Salerno Affidavit expands upon, and does not contradict, the Rule 30(b)(6) deposition testimony of Taglienti. Accordingly, the Court denies Vertex's motion to strike the Salerno Affidavit.

Vertex also moves to strike certain documents on the grounds that PHI's production of those documents was untimely. Docket No. 111. PHI produced such documents well after the discovery deadline and, in some cases, after the deadline for filing dispositive motions. There are three categories of documents at issue: (1) PHI's June 2011 fax journals; (2) Cincinnati Bell phone bills; and (3) documents concerning PHI's fax machine. With respect to the June 2011 fax journals, PHI has explained that it had mistakenly produced June 2010 journals and it was not until a deposition on June 14, 2016 that it realized its mistake. See Docket No. 90 at 6. Vertex has not provided any evidence that PHI's late production of June 2011 fax journals was anything other than a mistake.

With respect to the phone bills, PHI maintains that such documents were not responsive to any of Vertex's discovery requests and that Vertex did not request such documents until June 2016. See Docket No. 90 at 2–5. However, PHI's reading of Vertex's discovery requests is much too narrow. Vertex's Request No. 7 sought "[a]ll documents concerning any fax receiver that PHI alleges received Exhibit A, including but not limited to ... monthly invoices." Docket No. 83 at 7–8. The phone bills are plainly responsive and PHI should have searched for and produced such documents in a timely manner. Similarly, PHI states that it did not come across the additional documents regarding its fax machine until it searched for the phone bills. Docket No. 90 at 8. Again, PHI should have searched for, and produced such doc-

uments, when it received Vertex's discovery requests. While the Court does not condone PHI's behavior, these documents have now been provided and Vertex has not shown sufficient prejudice to preclude consideration of the documents. Accordingly, the Court declines to strike these documents from the summary judgment record.[2]

## B. Facts[3]

Vertex is a publicly traded specialty pharmaceutical company that develops, manufactures, and markets small-molecule drugs for treatment of diseases.[4] TAG is a "medical communications, meeting man-

agement and logistics company."[5] PHI is a healthcare provider specializing in chiropractic and pain management services located in Cincinnati.[6]

Among the products developed, manufactured, and marketed by Vertex in 2011 was the pharmaceutical Incivek.[7] Telaprevir is the generic name of Incivek.[8] Vertex obtained approval to sell Incivek in the United States on May 23, 2011.[9]

Incivek was a protease inhibitor developed by Vertex and approved by the FDA for the treatment of patients with hepatitis C ("HCV").[10] HCV is a serious and potentially fatal viral infection that damages a patient's liver over time, potentially result-

---

**2.** Vertex also seeks a finding of spoliation and sanctions. Docket No. 82. However, while PHI may have been lax with respect to its discovery obligations, Vertex has not shown that PHI destroyed any documents. Accordingly, the Court denies Vertex's motion for sanctions.

**3.** Because this case is before the Court on cross-motions for summary judgment, the Court sets out any disputed facts in the light most favorable to the non-moving party. See Ahern v. Shinseki, 629 F.3d 49, 53–54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)). The facts are taken from Defendant Tactical Advantage Group, LLC's Local Rule 56.1 Concise Statement of Material Facts (Docket No. 76) ("TAG SOF"); Statement of Undisputed Material Facts in Support of Defendant Vertex Pharmaceuticals Incorporated's Motion for Summary Judgment (Docket No. 78) ("Vertex SOF"); Plaintiff's Local Rule 56.1 Statement of Facts In Support of Plaintiff's Motion for Summary Judgment (Docket No. 86) ("PHI SOF"); Responses of Defendant Tactical Advantage Group, LLC's to the Statement of "Undisputed Material Facts" Filed by Physician's Healthsource, Inc. in Support of its Motion for Summary Judgment (Docket No. 92) ("TAG Resp. to PHI"); Responses of Defendant Tactical Advantage Group, LLC to the Statement of "Undisputed Material Facts" Filed by Vertex Pharmaceuticals Incorporated in Support of its Motion for Summary Judgment (Docket No. 94) ("TAG Resp. to Vertex"); Response of Defendant Vertex Pharmaceuticals Incorpo-

rated to Plaintiff's Local Rule 56.1 Statement of Facts in Support of Plaintiff's Motion for Summary Judgment (Docket No. 100) ("Vertex Resp. to PHI"); Plaintiff's L.R. 56.1 Response to Defendant Vertex Pharmaceuticals Inc.'s Statement of Material Facts in Support of its Motion for Summary Judgment (Docket No. 101) ("PHI Resp. to Vertex"); and Plaintiff's L.R. 56.1 Response to Defendant TAG Advantage Group, LLC's Statement of Material Facts in Support of its Motion for Summary Judgment (Docket No. 102) ("PHI Resp. to TAG").

**4.** PHI SOF ¶ 1; Vertex Resp. to PHI ¶ 1; TAG Resp. to PHI ¶ 1.

**5.** PHI SOF ¶ 2; Vertex Resp. to PHI ¶ 2; TAG Resp. to PHI ¶ 2.

**6.** Vertex SOF ¶ 5; PHI Resp. to Vertex ¶ 5; TAG Resp. to Vertex ¶ 5.

**7.** PHI SOF ¶ 4; Vertex Resp. to PHI ¶ 4; TAG Resp. to PHI ¶ 4.

**8.** PHI SOF ¶ 6; Vertex Resp. to PHI ¶ 6; TAG Resp. to PHI ¶ 6; see also Vertex SOF ¶ 7; PHI Resp. to Vertex ¶ 7; TAG Resp. to Vertex ¶ 7.

**9.** PHI SOF ¶ 5; Vertex Resp. to PHI ¶ 5; TAG Resp. to PHI ¶ 5.

**10.** Vertex SOF ¶ 8; PHI Resp. to Vertex ¶ 8; TAG Resp. to Vertex ¶ 8.

ing in the need for a liver transplant.[11] Protease inhibitors are drugs that inhibit viral replication by interfering with the chemical process that viruses use to replicate themselves and produce infectious viral particles.[12]

Before the introduction of protease inhibitors, HCV was treated using a two-drug therapy of pegylated interferon and ribavirin.[13] The protease inhibitors changed the treatment model by introducing a third drug to the treatment regimen that significantly increased the cure rate for patients receiving the therapy.[14] However, the three-drug therapy incorporating Incivek was complex to administer and presented a number of potential side effects and risks.[15] In light of the complexity of the Incivek three drug treatment regimen, and the associated risks, Vertex wanted to make practitioners aware of the indications, contraindications, dosing and side effects associated with Incivek, in order to enable them to treat and educate their patients.[16] Therefore, Vertex decided to create a satellite broadcast program.[17]

To that effect, Vertex entered into a Master Professional Services Agreement, Service #7 ("MSA") with TAG.[18] The MSA provided that "[t]he educational goal of this promotional launch initiative is to educate an estimated 3,000 targeted community GE's, NP's, PA's, and other important health care providers that deal in the management of HCV within the first weeks of launch."[19] Pursuant to the MSA, TAG was "to provide a high definition (HD) broadcast service from a studio based in Secacus, N.J. to 50 restaurant sites in major markets across the United States," which would allow "engaging of high-value, hard-to-reach audiences through live, custom-made television programming," the objective of which would be to "effectively communicate to a national Gastroenterology audience about telaprevir [Incivek] labeling immediately upon approval."[20] TAG also contracted to offer a "live, online HD quality broadcast accessible to any device with an internet connection," which TAG stated "offers a cost effective way to expand your reach to physicians that are unable to be present at a live location."[21] The total "Services Fee" was $171,600 and estimated pass-through costs of $639,000.[22]

PHI alleges that on or about June 6, 2011 and June 7, 2011, defendants transmitted to PHI by telephone facsimile machine three invitations to the satellite broadcast.[23] The faxes were sent by TAG.[24]

11. Vertex SOF ¶ 8; PHI Resp. to Vertex ¶ 8; TAG Resp. to Vertex ¶ 8.

12. Vertex SOF ¶ 8; PHI Resp. to Vertex ¶ 8; TAG Resp. to Vertex ¶ 8.

13. Vertex SOF ¶ 10; PHI Resp. to Vertex ¶ 10; TAG Resp. to Vertex ¶ 10.

14. Vertex SOF ¶ 11; PHI Resp. to Vertex ¶ 11; TAG Resp. to Vertex ¶ 11.

15. Vertex SOF ¶¶ 12–19; PHI Resp. to Vertex ¶¶ 12–19; TAG Resp. to Vertex ¶¶ 12–19.

16. Vertex SOF ¶ 20; PHI Resp. to Vertex ¶ 20; TAG Resp. to Vertex ¶ 20.

17. Vertex SOF ¶¶ 20–23; PHI Resp. to Vertex ¶¶ 20–23; TAG Resp. to Vertex ¶¶ 20–23.

18. PHI SOF ¶ 10; Vertex Resp. to PHI ¶ 10; TAG Resp. to PHI ¶ 10.

19. PHI SOF ¶ 11; Vertex Resp. to PHI ¶ 11; TAG Resp. to PHI ¶ 11.

20. PHI SOF ¶ 12; Vertex Resp. to PHI ¶ 12; TAG Resp. to PHI ¶ 12.

21. PHI SOF ¶ 13; Vertex Resp. to PHI ¶ 13; TAG Resp. to PHI ¶ 13.

22. PHI SOF ¶ 18; Vertex Resp. to PHI ¶ 18; TAG Resp. to PHI ¶ 18.

23. Complaint ¶ 12. The Complaint originally alleged a fourth fax. PHI admits that the fourth fax does not contain a header or any contact information and has withdrawn the document from consideration in this case. PHI Resp. to Vertex ¶¶ 61–64.

24. See Vertex SOF ¶¶ 40, 43; TAG Resp. to Vertex ¶¶ 40, 43. There is no dispute that TAG

The faxes indicate that they were sent to the fax number 513–922–2009.[25] The first fax's header contains a June 6, 2011 16:51:19 date and time stamp.[26] The second fax's header contains a June 6, 2011 16:54:05 date and time stamp.[27] The third fax's header contains a June 7, 2011 11:23:55 date and time stamp.[28] The first page of all faxes states:

Please join us for an

**interactive meeting**

presented via satellite broadcast!

**INCIVEK:**

**A Change in the**

**Treatment Paradigm**

Thursday, June 9, 2011

7:00 PM

Mitchell's Fish Market

One Levee Way, Suite 2129

Newport, KY 41071

Moderated by:

Carrie Jennings, NP

U. of Cincinnati

[29]

The second page explains that "[f]our national experts will review the latest data on INCIVEK as a change in the treatment paradigm. The presentation will include a live Q & A session, followed by an in-depth discussion with your local moderator."[30] The second page also lists the faculty as (1) Kimberly Brown, MD, Chief of Gastroenterology and Hepatology at Henry Ford Hospital in Detroit, Michigan; (2) Steven L. Flemm, M.D., Professor of Medicine and Surgery at Northwestern University Feinberg School of Medicine in Chicago, Illinois; (3) Andrew J. Muir, MD, MHS, Director of GI/Hepatology Research Program and Associate Professor of Medicine at Duke University Medical Center in Durham, North Carolina; and Robert S. Brown, Jr., MD, MPH, Frank Cardlle Professor of Medicine and Surgery and Chief, Center for Liver Disease and Transplantation at Columbia University Medical Center in New York, New York.[31]

The faxes provided a fax number and email address for invitees to sign up. They also indicated that "[i]f you are unable to join us in person, you are invited to view the presentation online at www. vertexmeetings.com/webcast."[32] In addition, the faxes stated that "[i]f you no longer wish to receive faxes from Tactical Advantage Group, please send a request to DoNotFax@taggrp.com or call 1–877–925–9550." The faxes contained the Vertex and Incivek logos.[33]

The intended recipient of the faxes was Jose Martinez, MD.[34] Dr. Martinez was a medical doctor specializing in pain management who had been employed by PHI until about a month and a half before PHI received the faxes.[35] Dr. Martinez was not board certified as a gastroenterologist and did not practice gastroenterology, nor did he hold himself out as practicing gastroenterology.[36]

---

sent the faxes. The parties dispute, however, whether in doing so, TAG exceeded the scope of its authority under the MSA. See id.; Docket No. 77 at 21–25; Docket No. 93 at 3–5.

**25.** Docket No. 80–15.

**26.** Docket No. 80–15 at 3–4.

**27.** Docket No. 80–15 at 5–6.

**28.** Docket No. 80–15 at 7–8.

**29.** Docket No. 80–15.

**30.** Id.

**31.** Id.

**32.** Id.

**33.** Id.

**34.** Id.

**35.** Vertex SOF ¶ 66; PHI Resp. to Vertex ¶ 66; TAG Resp. to Vertex ¶ 66.

**36.** Vertex SOF ¶ 67; PHI Resp. to Vertex ¶ 67; TAG Resp. to Vertex ¶ 67.

The satellite broadcast consisted of a presentation of the FDA-approved package insert information about Incivek, followed by interactive Q & A with the panelists.[37] The information presented was compiled in a slide deck that covered the following topics:

a. Background on HCV, including prevalence of infection, the HCV lifecycle, and the mechanism for treatment of HCV using the three-drug regimen;

b. Indications and contraindications for Incivek;

c. Use of "response-guided therapy," with related periodic testing and assessment requirements, to administer Incivek;

d. Dosage requirements and "treatment futility rules" indicating when treatment with Incivek should cease;

e. Research findings during Phase III clinical studies, including detailed statistics concerning subjects' responses to the therapy;

f. Potential side effects and their management, including anemia, rashes and anal burning;

g. Known and potentially significant drug interactions; and

h. Warnings, precautions, and safety information.[38]

The faculty members presented the information in the slide deck and then responded to questions and answers concerning dosing and side effects in a segment moderated by Dr. Kimberly Brown.[39] Each slide in the deck contained the trademarked word INCIVEK.[40]

## III. ANALYSIS

### A. Standard Of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted).

The Court "must scrutinize the evidence in the light most agreeable to the nonmovants, who are entitled to the benefit of all reasonable inferences therefrom." Ahern v. Shinseki, 629 F.3d 49, 53–54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004)). "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Id. (citations omitted).

 "Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted). "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Id. "Where, as here, a district court rules simultaneously on cross–motions for summary judgment, it must view each motion, separately,

---

37. Vertex SOF ¶ 29; PHI Resp. to Vertex ¶ 29; TAG Resp. to Vertex ¶ 29.

38. Vertex SOF ¶ 30; PHI Resp. to Vertex ¶ 30; TAG Resp. to Vertex ¶ 30.

39. Vertex SOF ¶ 31; PHI Resp. to Vertex ¶ 31; TAG Resp. to Vertex ¶ 31.

40. PHI Resp. to Vertex ¶ 31.

through this prism." Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.")).

### B. The TCPA

■ Congress passed the TCPA in 1991, prompted by "[v]oluminous consumer complaints about abuses of telephone technology." St. Louis Heart Center, Inc. v. Forest Pharmaceuticals, Inc., No. 4:12-CV-02224, 2013 WL 1076540, at *2 (E.D. Mo. Mar. 13, 2013) (quoting Mins v. Arrow Fin. Servs., 565 U.S. 368, 132 S.Ct. 740, 744, 181 L.Ed.2d 881 (2012)). The TCPA "bans certain practices invasive of privacy and directs the Federal Communications Commission . . . to prescribe implementing regulations." Id.

■ The TCPA outlaws multiple abuses of telephone technology. At issue here, the TCPA "proscribes sending unsolicited advertisements to fax machines." Id. (citing Mins, 132 S.Ct. at 745). The TCPA was intended to address the costs—including paper, ink, and time—of receiving unwanted "junk" faxes. Spine and Sports Chiropractic v. ZirMed, Inc., No. 3:13-CV-00489-TBR, 2014 WL 2946421, at *5 (W.D. Ky. June 30, 2014). These costs also include the tying up of the fax machine while processing junk faxes. Id. (citation omitted). Thus, the TCPA provides for private lawsuits by owners and subscribers of fax phone numbers who receive unsolicited advertisements. See id.; 47 U.S.C. § 227(b)(3). To prevail on a TCPA action, the plaintiff must show that "(1) defendant used a telephone facsimile machine, computer or other device to send one or more faxes to plaintiffs' facsimile machines; (2) the faxes sent contained material advertising the commercial availability or quality of any property, goods, or services, and (3) plaintiffs did not give prior express invitation or permission for defendant to send the faxes." Sparkle Hill, Inc. v. Interstate Mat. Corp., No. 11-10271-RWZ, 2014 WL 2215756, at *2 (D. Mass. May 23, 2014) (citation omitted).[41]

### C. Standing

■ The defendants argue that PHI lacks standing to bring this suit. Docket No. 77 at 14–20; Docket No. 74 at 15–17. If PHI lacks standing to bring this matter before the Court, the Court lacks jurisdiction to decide the merits of the case. Libertad v. Welch, 53 F.3d 428, 436 (1st Cir. 1995) (citation omitted). "Thus, standing is a threshold issue, determining whether the court has the power to hear the case, and whether the putative plaintiff is entitled to have the court decide the merits of the case." Id.

■ "Standing involves 'a blend of constitutional requirements and prudential considerations.'" N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) (quoting Valley Forge Christian Coll. v. Americans United for Separation of Church and State, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). A federal court is empowered only to decide "cases" and "controversies." Id. (citing U.S. Const. art. III). "Not every dispute is a case or controversy. 'The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements.'" Id. (citation omitted).

■ In order to establish standing, PHI "must have (1) suffered an injury in

---

41. Although some cases list lack of consent as one of the elements of a TCPA claim, the FCC and courts have interpreted consent as an affirmative defense under the TCPA. See St. Louis Heart Center, Inc., 2013 WL 1076540, at *2, n. 2. Thus, the burden of demonstrating that a facsimile was not unsolicited rests with the sender. Id.

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, — U.S. —, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 180–181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000)). PHI bears the burden of establishing these elements. Id. (citing FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990)).

The defendants make two arguments in support of their assertion that PHI lacks standing. First, they argue that PHI has presented no evidence that it received the faxes on which it bases the claims in this case because there is no evidence in the record that PHI owned or subscribed to the fax line reflected on the faxes. Docket No. 74 at 15–18; Docket No. 77 at 15–17. Second, Vertex argues that PHI has presented no evidence that it sustained any concrete injury. Docket No. 77 at 17–20. The Court disagrees.

Whether PHI owned the fax or was the subscriber to 513–922–2009 in 2011 presents an issue of fact. PHI's Rule 30(b)(6) representative testified, under oath, that 513–922–2009 was PHI's "dedicated phone line that it used to send and receive faxes" in 2011.[42] Dr. Elwert, PHI's other principal, testified that this was PHI's "main fax line" in 2011.[43] Another of PHI's employees, Ms. Curtis, also testified that PHI was the subscriber to 513–922–2009.[44]

Vertex points to documents produced by Cincinnati Bell and argues that those documents establish that 513–922–2009 was registered to Comprehensive Pain Solutions, not PHI. See Docket No. 77 at 16. However, those documents fail to establish that PHI was not the subscriber to that fax number. While those documents name Comprehensive Pain Solutions, they also name PHI. See Docket No. 81–16. Vertex has produced no evidence to interpret those documents so as to establish that PHI was not a subscriber to the number. In addition, PHI has produced Cincinatti Bell invoices for that fax line addressed to PHI.[45] In light of the evidence provided by PHI on this issue, there is a triable issue of fact as to whether PHI was the subscriber to 513–922–2009.

 Equally unavailing is Vertex's argument that PHI has presented no evidence that it suffered a concrete injury. "Injury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'" Spokeo, 136 S.Ct. at 1547–1548 (citations omitted). To establish injury in fact, PHI must show that it suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (citing Lujan, 504 U.S. at 560, 112 S.Ct. 2130). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" Id. (citations omitted). A "concrete" injury is one that is "real," and not "abstract." Id.

 Citing to Spokeo and other cases discussing it, Vertex argues that PHI may not rest solely on evidence of a violation of the TCPA in order to establish a concrete injury. See Docket No. 77 at 17–20. In Spokeo, the Supreme Court recognized

---

42. PHI SOF ¶ 70; PHI Resp. to Vertex ¶ 72.

43. PHI Resp. to Vertex ¶ 72.

44. PHI Resp. to Vertex ¶¶ 72, 73.

45. Docket No. 90–9.

that Congress may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." Spokeo, 136 S.Ct. at 1549. However, the Court also noted that merely asserting a "bare procedural violation, divorced from any concrete harm," will not satisfy the concreteness requirement. Id. "This observation has little application to claims under the TCPA, since those claims are not based on 'bare procedural' rights, but rather on substantive prohibitions of actions directed toward specific consumers." Mey v. Got Warranty, Inc., 193 F.Supp.3d 641, 644 (N.D.W.Va. 2016). As another court observed with respect to a different section of the TCPA:

> The Supreme Court's point in Spokeo was not that a statutory violation cannot constitute a concrete injury, but rather that where the bare violation of a statute conferring a procedural right could cause a congressionally identified harm or material risk of harm and just as easily could not, it is not sufficient simply to allege that the statute at issue was violated. Failure to ensure the accuracy of a consumer report may result in harm or material risk of harm the FCRA was intended to curb—loss of employment opportunities, for example, or a decrease in the consumer's creditworthiness. But it may also fail to cause any harm or material risk of harm at all. Put differently, the procedural rights imposed through section 1681e(b) are attenuated enough from the interests Congress identified and sought to protect through the FCRA that charging a defendant with violating them is not necessarily the same as charging the defendant with causing a congressionally-identified concrete injury that gives rise to standing to sue.
>
> The same cannot be said of the TCPA claims asserted in this case. Unlike the

statute at issue in Spokeo) ..., the TCPA section at issue does not require the adoption of procedures to decrease congressionally-identified risks. Rather, section 227 of the TCPA prohibits making certain kinds of telephonic contact with consumers without first obtaining their consent. It directly forbids activities that by their nature infringe the privacy-related interests that Congress sought to protect by enacting the TCPA. There is no gap—there are not some kinds of violations of section 227 that do not result in the harm Congress intended to curb, namely the receipt of unsolicited telemarketing calls that by their nature invade the privacy and disturb the solitude of their recipients.

Aranda v. Caribbean Cruise Line, Inc., 202 F.Supp.3d 850, 857 (N.D. Ill. 2016). Similarly, the provision of the TCPA that PHI invokes in this case was intended to protect citizens from the loss of the use of their fax machines during the transmission of fax data. Palm Beach Golf Center–Boca, Inc. v. John G. Sarris, D.D.S., P.A., 781 F.3d 1245, 1252 (11th Cir. 2015). Fax telemarketing "is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." Id. (emphasis in original; citing H.R. REP. NO. 102–317, at 10 (1991)). Therefore, Congress created a private right of action for enforcement of violations of this provision and provided for statutory damages for a junk fax recipient. Id. "Notably, a prevailing plaintiff need not have suffered any monetary loss in order to recover statutory damages." Id. (citation omitted).

In this case, there is evidence that the faxes were sent to PHI's fax line.[46] The

---

**46.** Docket No. 80–15; Docket No. 80–20 at 59.

faxes rendered PHI's fax line "unavailable for legitimate business messages while processing . . . the junk fax." Palm Beach Golf Center–Boca, Inc., 781 F.3d at 1252 (citing ,H.R. REP. NO. 102–317, at 10). This occupation of PHI's fax machine is among the injuries intended to be prevented by the TCPA and is sufficiently personal or particularized to PHI as to provide standing.

Accordingly, the Court finds that the defendants are not entitled to summary judgment in their favor based on lack of standing.

### D. Issues Of Fact Preclude Summary Judgment On The Merits Of PHI's TCPA Claim

#### 1. Consent

■ Vertex argues that it is entitled to summary judgment because PHI has not met its burden to show that the faxes were unsolicited. Docket No. 77 at 8–9. However, it is Vertex who ultimately bears the burden of showing consent. Around the World Travel, Inc. v. Unique Vacations, Inc., No. 14-CV-12589, 2014 WL 6606953, at *2 (E.D. Mich. Nov. 19, 2014); Spine and Sports Chiropractic, Inc. v. ZirMed, Inc., 2014 WL 2946421, at *19, n. 22 (citing Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967, at 25972); Sadowski v. Med1 Online, LLC, No. 07 C 2973, 2008 WL 2224892, at *4 (N.D. Ill. May 27, 2008). Vertex has not provided any evidence that PHI consented to receiving the faxes. Accordingly, Vertex is not entitled to summary judgment based on a consent defense.

#### 2. Unsolicited Advertisements

■ The defendants also argue that PHI cannot show that the fax invitations at issue are "advertisements" under the TCPA. Docket No. 74 at 9–15; Docket No. 77 at 9–14. PHI argues that the faxes are advertisements as a matter of law. Docket No. 85 at 5–10; Docket No. 96 at 4–6. The Court finds that issues of fact preclude summary judgment on this issue.

The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5). "Congress has not spoken directly on the issue of whether an advertisement for free services can be unsolicited advertisements under the TCPA." North Suburban Chiropractic Clinic, Ltd. v. Merck & Co., Inc., No. 13 C 3113, 2013 WL 5170754, at *2 (N.D. Ill. Sept. 13, 2013) (quoting GM Sign, Inc. v. MFG.com, Inc., No. 08 C 7106, 2009 WL 1137751, at *2 (N.D. Ill. Apr. 24, 2009)).

Because the TCPA is silent on the meaning of "advertisement," the FCC has provided examples as to what constitutes an unsolicited advertisement in its Regulations. See In re Rules and Reg. Implementing the Tel. Consumer Prot. Act of 1991 and the Junk Fax Prevention Act of 2005, 21 F.C.C.R. 3787 (Apr. 6, 2006). The FCC has clarified that four types of messages do not fall under the purview of the TCPA: (1) informational messages, (2) transactional messages; (3) non-commercial messages from non-profit organizations; and (4) non-advertisement messages with an incidental amount of advertising. Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc., No. 12-2132 (FLW), 2013 WL 486207, at *3 (D.N.J. Feb. 6, 2013).

The FCC and courts have recognized that "faxes promoting a free seminar may constitute an 'unsolicited advertisement' since free seminars are often a pretext to market products or services." North Sub-

urban Chiropractic Clinic, Ltd., 2013 WL 5170754, at *3 (citing Physicians Healthsource, Inc. v. Alma Lasers, Inc., No. 12 C 4978, 2012 WL 4120506, at *2 (N.D. Ill. Sept. 18, 2012)); see also Phillip Long Dang, D.C., P.C. v. XLHealth Corp., No. 1:09-CV-1076-RWS, 2011 WL 553826, at *3–4 (N.D. Ga. Feb. 7, 2011). Thus, the inquiry is highly fact specific. For example, the Ninth Circuit has held that because the item discussed in a fax was not "available to be bought or sold" or "for sale," it was not "commercially available" and not an advertisement under the FTCA. N.B. Indus. Inc. v. Wells Fargo & Co., 465 Fed.Appx. 640, 642 (9th Cir. 2012). Other courts have held that an unsolicited fax from a pharmaceutical company about the reclassification of a drug—without any reference to how or where the drug was available for purchase—was not an advertisement. Physicians Healthsource, Inc. v. Janssen, 2013 WL 486207, at *7. Another court has held that faxes from a preferred provider organization to non-participating healthcare providers are not advertisements when they do not promote the benefits of becoming a member or sell things to the recipient. Long Dang, 2011 WL 553826, at *3–4.

On the other hand, courts have found that a fax inviting individuals to a free seminar on the latest advancements on orthopedics sent by a company that sold products used in joint replacement and trauma surgeries could be an advertisement under the TCPA. Physicians Healthsource, Inc. v. Stryker Sales Corp., 65 F.Supp.3d 482, 489–494 (W.D. Mich. 2015). Among other things, the court found that the information referenced on the fax and the seminar itself could have led invitees, who were primary care physicians, to refer more patients or discuss orthopedic products more frequently, which could stimulate the demand for defendant's products. Id. at 491. Another court declined to hold that invitations to a medical discussion re-

garding the treatment of hypertension (1) sent by a pharmaceutical manufacturer, (2) linked to that manufacturer's hypertension drug, and (3) addressed to a physician are not, as a matter of law, advertisements under the TCPA. St. Louis Heart Center, Inc., 2013 WL 1076540, at *4.

Based on a review of the evidence before the Court, neither party is entitled to summary judgment on this issue. A reasonable fact-finder, drawing all inferences in favor of PHI, could conclude that the faxes, at least in part, promote the quality and availability of Incivek. The faxes display the Incivek and Vertex logos, and Incivek was commercially available at the time the faxes were sent. Docket No. 80–15. The faxes described Incivek as "New" and a "Change in the Treatment Paradigm." Id. The slide deck used for the seminar contains the Incivek logo on every page. Docket No. 80–10. Based on that evidence, a jury could find that Vertex intended the seminar to promote the commercial availability of Incivek and to encourage physicians to prescribe it, which would in turn result in an increased demand for Incivek.

On the other hand, a reasonable fact-finder, drawing all inferences in favor of defendants, could conclude that the faxes concerned an educational program presenting important clinical and patient safety information concerning the treatment of HCV. The faxes do not say anything about the quality or commercial availability of Incivek; do not say that they are available for sale; where or how it can be purchased, or what Incivek is or actually does.

The issue of whether the faxes were advertisements, therefore, simply cannot be decided as a matter of law in this case. Accordingly, the Court will deny all parties' motions for summary judgment.

### 3. Scope Of Authority

██ Finally, Vertex argues that it cannot be held liable for the faxes because

TAG "exceeded its authority" as Vertex's agent when it sent the faxes to Dr. Martinez by (1) violating its "representation" or "warranty" that it would comply with all applicable laws and (2) sending the faxes to non-gastroenterologists in violation of the agreement between Vertex and TAG. Docket No. 77 at 21–25. The Court disagrees.

▇ The TCPA makes it unlawful "to send" an unsolicited fax advertisement. 47 U.S.C. § 227(b)(1)(C). The FCC has issued regulations defining the sender as a "person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). "The plain language of the TCPA and the FCC's accompanying definition of "sender" together establish that under the TCPA direct liability attaches to the entity whose goods are advertised as opposed to the fax broadcaster." Imhoff Investment, LLC v. Alfoccino, Inc., 792 F.3d 627, 634 (6th Cir. 2015). In addition, whether the "on behalf" liability applies "does not depend upon the application of federal common law vicarious liability principles," and the only relevant consideration is whether "the defendant has hired an independent contractor to transmit facsimiles advertising the defendant's goods or services." FCC Amicus Letter, Palm Beach Golf Ctr.-Boca, Inc. v. Sarris, No. 13-14013, 2014 WL 3962595, at *1 (11th Cir. Jul. 17, 2014); see also Palm–Beach Golf Ctr.–Boca, Inc., 781 F.3d at 1257 (finding that the FCC's construction of who constitutes a sender under the TCPA is a reasonable interpretation of Congressional intent under the TCPA and does not conflict with the statute's underlying legislative history).

Here, according to Vertex's own version of events, it contracted with TAG to assist in the development and execution of the broadcast, including sending the fax invitations at issue in this case.[47] Accordingly, the Court finds that Vertex is not entitled to summary judgment on this issue.

## IV. ORDER

For the foregoing reasons, the Court denies the parties' motions for summary judgment.

---

47. See generally Vertex SOF ¶¶ 35–47.